<u>NOT FOR PUBLICATION</u>

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

------------------------------------------------------------x

TOWNSHIP OF BLOOMFIELD BOARD OF          :
EDUCATION,
                                          :
         Plaintiff,                       :
                                          :          Civ. No. 04-3725 (DRD)
               v.                         :
                                          :
S.C. o/b/o T.M.; STATE OF NEW JERSEY;     :          <u>OPINION</u>
DEPARTMENT OF EDUCATION FOR               :
NEW JERSEY                                :
                                          :
         Defendants                       :
                                          :
------------------------------------------------------------x

Mark A. Wenczel, Esq.
Anthony Frank Malanga, Jr., Esq.
GACCIONE, POMACO & MALANGA PC
524 Union Avenue
P.O. Box 96
Belleville, New Jersey 07109

     Attorneys for Plaintiff Township of Bloomfield Board of Education

Esther Canty-Barnes, Esq.
RUTGERS SPECIAL EDUCATION CLINIC CENTER FOR LAW AND JUSTICE
123 Washington Street
Newark, New Jersey 07102-3192

     Attorneys for Defendant S.C. o/b/o T.M.

Peter C. Harvey
Attorney General of New Jersey
R.J. Hughes Justice Complex
P.O. Box 112
Trenton, New Jersey 08625
Michael C. Walters

1

Carolyn G. Labin
Deputy Attorneys General

      Attorneys for Defendants New Jersey Department of Education and the State of New Jersey

**DEBEVOISE, Senior District Judge**

      This matter is before the Court upon: (i) the motion of the State of New Jersey and New Jersey Department of Education (together "State Defendants"), for dismissal of the Complaint against them; (ii) the motion of the Township of Bloomfield Board of Education (the "Board") for summary judgment against the State Defendants; (iii) the motion of the Board for summary judgment reversing the June 29, 2004 Order of the Administrative Law Judge; (iv) the motion of S.C. o/b/o T.M. ("S.C.")[1] for summary judgment affirming the June 29, 2004 Order of the Administrative Law Judge; and (v) the motion of S.C. o/b/o TM for imposition of sanctions on the Board or its attorneys.

      Bloomfield filed its Complaint appealing a decision of an Administrative Law Judge finding that Bloomfield is required to pay for T.M.'s residential placement.  In its Complaint, Bloomfield also alleges that the State Defendants failed to promulgate an interagency agreement pursuant to the Individuals with Disabilities Education Act ("IDEA"), and that as a result of their failure to do so, Bloomfield has been burdened with the entire cost and responsibility of T.M.'s residential placement.

## I. Background

This case arises under the IDEA, 20 U.S.C. § 1400 *et seq.,* a statute through which

---

[1] S.C. moves in this case on behalf of her son T.M.

Congress provides federal funds to state and local agencies to assist with the education of disabled children. Under the IDEA, a school district which receives federal assistance is required to provide a disabled child with a free and appropriate public education ("FAPE"). *See* 20 U.S.C. §1412(1). Each state education agency ("SEA") or local education agency ("LEA") is responsible for devising an individualized education program ("IEP") for the child and providing other safeguards to protect the child's right to an FAPE. *See* 20 U.S.C. §1415. In New Jersey, the LEA responsible for providing a FAPE is the local school district, in this case, Bloomfield. *See N.J.A.C.* 6A:14-1.1(d). The IDEA imposes procedural requirements on the states as well. IDEA procedures require that a child advocate have the opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child. *See* 20 U.S.C. §§ 1415(a) & 1415(b)(6). When a complaint is received under §1415, a due process hearing may result via the states's administrative law process. *See* 20 U.S.C. §1415(f)(1). In New Jersey, the agency designated to handle these complaints is the Office of Administrative Law, and an Administrative Law Judge ("ALJ") adjudicates disputes. An ALJ's decision may be appealed to a United States District Court. *See* 20 U.S.C. §1415(i)(2).

T.M. was born on May 24, 1990 and resides with his mother, S.C., in the Township of Bloomfield. The Bloomfield Board of Education operates a kindergarten through twelfth grade school district. T.M. is a student eligible for special education services under the IDEA (at the time of the filing of the Complaint, T.M. was thirteen years old). T.M.'s eligibility is based upon a classification of emotionally disturbed.

T.M. has been multiply diagnosed[2], has required numerous psychiatric hospitalizations and therapeutic services from a number of providers[3], and has been on several psychotropic medications to address his behavioral and psychological instability.  T.M. was classified as emotionally disturbed in January 1999 while attending the Franklin Elementary School ("Franklin") in the Bloomfield school district.  While at Franklin, T.M. was cited by school administration and suspended on approximately thirteen occasions.[4]

In the Fall of 2000 T.M. entered Bloomfield Middle School ("BMS").  When T.M. entered BMS, S.C. requested a reevaluation of T.M. and a residential placement.  Bloomfield denied S.C.'s request.  T.M.'s disruptive behavior continued while he was enrolled at BMS[5] and in December 2002 T.M. was suspended and placed on home instruction.  Bloomfield conducted a reevaluation of T.M. following his suspension.

On or about January 18, 2001, while he was at BMS, Dr. Ellen Platt, a child analyst and psychiatrist, evaluated T.M. and recommended that T.M.: 1) be placed in a highly structured

---

[2] T.M.'s diagnoses include Bi-Polar Disorder, Attention Deficit and Hyperactivity Disorder, Combined Type Learning Disorder, Oppositional Defiant Disorder, Intermittent Explosive Disorder, Mood Disorder, and Sleep Apnea.  Medical and psychiatric evaluations suggest T.M. may also suffer from Obsessive-Compulsive Disorder, Conduct Disorder, Post Traumatic Stress Disorder, Attachment Disorder, Tourettes Syndrome, and possible Autistic-like behavior.

[3] T.M. has been hospitalized at Clara Mass Medical Center, East Orange General Hospital, Mountainside Hospital, Newark Beth Israel Medical Center, St. Mary's Hospital and Summit Hospital.  T.M. has received outpatient services at the East Orange Hospital Clinic and Adolescent Psychiatric Services since 2001.

[4] T.M. had a history of threatening other students and verbally and physically attacking other students.

[5] T.M. was cited for, *inter alia,* truancy, vandalism of school property, threatening other students, physical violence against other students and disobeying authority.

4

classroom setting with minimum distractions and behaviorally oriented techniques, 2) receive social skills training, and 3) receive intense psychotherapy with individual and family components.  On or about October 10, 2001, S.C. signed an IEP that was prepared by the IEP team and she requested that it be implemented immediately.   T.M.'s program included placement in the regular classroom with in and out of class support, modifications and supplemental aids and services.  A modified behavior intervention plan was in place.  However, T.M.'s behavior became more disruptive and inappropriate as the school year proceeded.

In the fall of the 2002-2003 school year, T.M. exhibited increasingly disruptive and inappropriate behavior and the IEP team concluded that T.M. should be placed on home instruction pending the completion of child study team evaluations, including a psychiatric evaluation by Dr. Platt.  S.C. consented to the evaluations and the home instruction placement pending receipt of the evaluations.  A manifest determination was conducted at the hearing and it was determined that T.M.'s behavior was a manifestation of his disability.  In or about December 2002, Dr. Platt conducted a psychiatric assessment as a part of the reevaluation and she found: 1) T.M.'s behavior had worsened, 2) T.M. had an affinity for sociopathic behavior, and 3) T.M. had a tremendous amount of rage.  Dr. Platt also concluded that T.M. posed a threat to other children and needed to be placed in a highly restrictive program with 24-hour monitoring and supervision outside of the regular school setting.  S.C. was advised to pursue intensive psychiatric treatment, monitoring, and follow-up for further diagnostic clarification and psychotropic medication.[6]  At the reevaluation meeting in December 2002, Bloomfield offered

---

[6] In June 2003, Dr. Platt clarified her recommendation, noting that psychiatric stabilization was necessary before other areas could be addressed, twenty-four hour supervision

the Forest Glen School, an in-district alternative day school, as an appropriate placement for T.M. However, S.C. did not believe that Glen-Forest was an appropriate placement for T.M., and in January 2002, she filed a request for mediation with the United States Department of Education Office of Special Education Programs ("OSEP").

On February 5, 2003, Bloomfield and S.C. signed a mediation agreement, under which Bloomfield would look for an out of district placement and an IEP meeting would be held in May 2003 to determine the appropriate program for T.M. during the 2003-2004 school year. Pursuant to that agreement, Bloomfield tried to secure placements for T.M. However, on April 23, 2003, after an out of district placement was not located for T.M., S.C. filed a due process petition seeking, *inter alia*, a determination that a residential placement was appropriate and necessary under the IDEA. *See* 20 U.S.C. §§ 1400 *et seq.*

On May 22, 2003, a reevaluation planning meeting was held. At the meeting, the IEP team again offered Forest Glen as a potential placement. S.C. refused to allow T.M. to be placed at Forest Glen and wanted to look for a more appropriate placement, but Bloomfield refused. Because S.C. and Bloomfield could not reach an agreement, T.M. remained on home instruction for the remainder of the school year. With no other potential placements offered[7], S.C. independently pursued residential placements. By August 2003, T.M. had been accepted for a day placement at the High Point School ("HPS"), a state-approved school for emotionally disturbed children, located in Lodi, New Jersey. S.C. withdrew her due process complaint after

_____

was needed for T.M. for clinical monitoring and medical interventions, and therapeutic restructuring was needed before T.M. would be available for academic learning.

[7] T.M. had been rejected by a number of out-of-district and residential placements.

Bloomfield agreed to place T.M. at HPS and conduct additional evaluations.

At the time of the May 2003 IEP meeting, the Division of Youth and Family Services ("DYFS") determined that it would place T.M. in a residential facility provided S.C. consented, and that Bloomfield be responsible for the educational component while T.M. was placed at the residential facility.  In accordance with DYFS's request, Dr. Ruth Rivera, Director of Special Services at Bloomfield, told DYFS that Bloomfield would adhere to DYFS's request.  However, S.C. had already agreed to the placement of T.M. at HPS pending disposition of her due process petition.  S.C. also requested that Bloomfield pursue a day placement for T.M. at East Mountain Youth Services ("EMYS") and informed Bloomfield that she was not interested in pursuing any of the other day placements that Bloomfield was considering.  After EMYS determined that it did not have an appropriate placement for T.M., S.C. and Bloomfield agreed that T.M. would attend HPS and no further action would be taken to secure another day placement unless and until information was received that HPS was not appropriate.

In September 2003, T.M. began attending HPS.  At HPS, T.M. exhibited poor behavior, refused to do school work, threatened students and staff and was suspended on several occasions. It also became necessary to transport him to school individually.  In October 2003, per S.C.'s request, Bloomfield conducted a functional behavior assessment of T.M.  On November 18, 2003, S.C. and Bloomfield agreed to continue T.M.'s placement at HPS for the remainder of the 2003-2004 school year and to meet in February or March 2004 to consider the appropriateness of an extended school year for T.M. and whether a different placement should be sought for T.M. for the 2004-2005 school year.  According to the agreement, S.C. agreed to withdraw her due process petition without prejudice.

7

On or about February 2, 2004, before a behavior development plan could be developed for T.M., T.M. was expelled from HPS for threatening a teacher.[8]  On February 18, 2004, an IEP meeting was held at HPS to determine T.M.'s next placement.  At the meeting, Bloomfield offered IEPs for placement at Forest Glen or home instruction.  S.C. rejected both the potential placement and home instruction option, and she requested an out of district placement for T.M.

Because Bloomfield could not find an appropriate out of district placement, on or about March 12, 2004, S.C. filed a petition for a due process hearing with OSEP seeking the issuance of an order from the Office of Administrative Law directing Bloomfield to place T.M. in a residential facility.  The matter was transmitted to OSEP in accordance with 20 U.S.C. § 1415 and 24 C.F.R. § 300.500 to 300.587, and Administrative Law Judge Margaret M. Hayden (the "ALJ") was assigned to the case.  A hearing was held on April 8, June 9, 15 and 16, 2004[9].

At the due process hearing, Bloomfield stated its position that T.M. required medical stabilization before he could be educated[10].  Many of the professionals who examined T.M. testified at the hearing and provided evidence detailing the history of T.M.'s treatment and

---

[8] After his expulsion from HPS, T.M. was admitted to Summit Hospital at his own request and remained hospitalized there from February 2, 2004 to February 12, 2004.

[9] ALJ Hayden relied in part on S.C.'s testimony concerning T.M.'s medical and educational history, community services received and the schools she contacted in order to find an appropriate placement.

[10] Upon receipt of various reports and evaluations, the IEP team concluded that Forest Glen might not be an appropriate placement for T.M. because the reports and evaluations showed that T.M. required psychiatric stabilization.  The reports and evaluations included a neuropsychological evaluation conducted by Dr. Ellen Fenster-Kuehl (received on May 18, 2004), a review of records report by Dr. Jack Goralsky (received on May 26, 2004), and a psychiatric evaluation conducted by Dr. Mercedes Paine (received on June 10, 2004).

condition.  Dr. Platt testified that T.M. was unstable and needed around the clock treatment.[11]

In December 2002, Dr. Platt examined T.M. and was surprised by the extent to which T.M.'s

condition had deteriorated.  Dr. Jack Goralsky, a clinical psychologist, testified that T.M. would

need a residential placement with a solid psychiatric program and an educational component

including social skills training, anger management and individual and family therapy.  Dr.

Goralsky also testified that even if T.M. required stabilization in a hospital, T.M. would need a

residential educational placement subsequent to discharge.  Both Dr. Platt and Dr. Goralsky

testified that T.M. was not available for educational growth during periods throughout his

childhood.  Dr. Ellen Fenster-Kuehl, a clinical psychologist, also testified at the hearing.  She

recommended that T.M. be placed in a residential facility that included long term psychiatric

care, intensive individual and group psychotherapy, a 24 hour day treatment plan including

medication, drug monitoring and training for social skills.  She further testified that T.M. would

require long term care because T.M. would be unable to modulate his moods and behavior.  Dr.

Fenster-Kuehl concurred with Dr. Goralsky that even after being stabilized, T.M. would have to

go to a residential program.

Other professionals also concluded that T.M. needed a residential placement.  Both

Kristen Lowe, T.M.'s therapist, and Dr. Joy Robertson, T.M.'s psychiatrist, recommended a

residential placement for T.M.  On July 23, 2003, Dr. Allan J. Herman conducted an evaluation

which revealed that T.M. needed to be placed in a residential treatment facility where he could

receive both psychological treatment and an education.  On August 20, 2004, Dr. Mercedes

---

[11] Dr. Platt communicated to the district her concerns about T.M.'s condition as early as
January 2001.

Paine performed an evaluation on T.M., and she recommended that T.M. be placed in a residential placement program that was highly therapeutic, structured, and one that could meet his emotional and educational needs.  Michael Shave, the Senior Primary Therapist at the Adolescent Partial Hospitalization Unit at Jersey City Medical Center where T.M. was treated in November 2003, concluded that T.M. required the 24 hour supervision offered by residential care.

## II.  The ALJ's Decision

The ALJ set forth in detail the events of T.M.'s educational, psychological and family history.  She summarized the testimony of the various educational and psychiatric experts who appeared at the hearing.  She framed the issues as i) whether Bloomfield provided T.M. with a FAPE in the least restrictive environment and, if not, ii) whether T.M. needed a residential setting for educational purposes.

The ALJ noted Bloomfield's contention that although T.M. now needs a residential placement, it is strictly for psychiatric, not educational reasons.  She observed, however, that "the evidence showed T.M.'s emotional and educational needs are so intertwined that they cannot be separated.  Because his psychiatric, social, and emotional needs must be addressed in order for him to learn, T.M. requires a residential placement for educational purposes."

As to Bloomfield's placement of T.M. at High Point, the ALJ stated:

> Even before the High Point placement Dr. Platt had informed the District of T.M.'s need for 24 - hour monitoring and supervision in December 2002 . . . The extremely aggressive and hostile behavior of T.M. at High Point should certainly indicate to the District that High Point was not appropriate.

> • • •

10

> I CONCLUDE that the District has not met its burden of proving that it offered T.M. a FAPE in the least restrictive environment by the High Point placement. Moreover, there is no evidence of any difference between the placement at High Point and the placement at Forest Glen as far as increased therapeutic programming. Therefore, based on T.M.'s severe handicapped (sic), I CONCLUDE Forest Glen would not have provided a significant or meaningful education.

The ALJ addressed the question whether a residential placement, which by that time all parties agreed was required, was necessary to provide special education and related services to T.M. at no cost to his parent or whether full-time placement was the response to medical, social or emotional problems that are segregable from the learning process. Bloomfield argued that the placement was not for educational purposes but rather for medical purposes which were not covered by IDEA and the expenses of which were not the obligation of the school district. Relying on <u>Kruelle v. New Castle Co. School Dist.</u>, 642 F. 2d 687 (3d Cir. 1981), the ALJ found against Bloomfield, stating:

> Rather this placement is to provide integrated treatment to address his psychiatric, emotional, social and educational needs in order for him to be available for learning. I FIND that the residential placement proposed is not to provide acute psychiatric treatment but rather to provide a consistent therapeutic environment with intense therapeutic services to allow T.M. to receive an educational benefit. I FIND it is not possible to separate the need for the residential placement into a part that deals with the learning process and a part that does not because until his emotional, psychiatric and behavioral problems are addressed, he will not have a meaningful benefit from any academic program.

Based on these findings the ALJ concluded that i) a residential placement is necessary and appropriate for educational purposes, ii) Bloomfield must pay for all costs and related services of the residential placement, including diagnostic or evaluative services but not for those medical services that must be performed by a physician, 34 CFR 300.24, and iii) T.M. needs a highly

therapeutic treatment with an intense psychiatric component.  On June 29, 2004 the ALJ ordered Bloomfield to "provide a residential placement immediately and pay for the cost of tuition, room and board and all non-medical related services and costs."

T.M. now resides at Kids Peace, a restricted residential facility located in Allentown, Pennsylvania.  Bloomfield has appealed the ALJ's order requiring it to pay for the facility and it has joined the State Defendants seeking to enforce an asserted State obligation to enter into an interagency agreement under which the State would assume this payment.

The State Defendants have moved to dismiss Count II of Bloomfield's complaint asserted against them.  Bloomfield has moved for summary judgment on that Court.

Bloomfield moves for a summary judgment reversing the ALJ's June 29, 2004 order; defendant S.C. cross-moves for summary judgment affirming the June 29, 2004 order and also moves for sanctions.

### III. Discussion

A. State Defendants' Motion to Dismiss

State Defendants move to dismiss Count II of Plaintiff's Complaint pursuant to Fed.R.Civ.P. 12(b)(1) or Fed.R.Civ.P. 12(b)(6).

A FAPE is available to all children with disabilities residing in New Jersey between the ages of 3 and 21. *See* 20 U.S.C. § 1400 *et seq.*  Under the IDEA, an eligible student is entitled to, *inter alia*, have evaluations performed, an IEP developed based on the evaluations, and to receive a free public educational program that implements the IEP.  Plaintiff in this case, Bloomfield, is the LEA, and therefore it is required to implement the IDEA for all classified children from the ages of three to twenty-one. *See N.J.S.A.* 18A:46-6, 8-10, 13, 14.

The IDEA confers jurisdiction upon the United States district courts to hear actions brought under 20 U.S.C. § 1415, without regard to the amount in controversy. *M.A. ex rel. E.S. v. State-Operated Sch. Dist. of City of Newark*, 344 F.3d 335, 343 (3d Cir. 2003); 20 U.S.C. § 1415(i)(3)(A). This provision means that district courts have subject matter jurisdiction over actions challenging the procedural protections set forth in 20 U.S.C. § 1415.

Count II of the Complaint alleges that the State Defendants failed to facilitate the existence of interagency agreements, pursuant to 20 U.S.C. §1412(A) & (B) and 34 C.F.R. § 300.142, to ensure that services necessary for the provision of a FAPE are provided to T.M. in accordance with the mandates of the IDEA. (Comp. at ¶¶ 28-34). It is Bloomfield's contention that the State Department of Education should have entered into an agreement with DYFS to provide the kind of residential treatment that T.M. required which was essentially the provision of medical services rather than educational services or services related thereto. The question presented is whether the IDEA creates a private right action for an LEA against the State to compel funding.

On their motion to dismiss Count II of Plaintiff's Complaint, State Defendants contend that Bloomfield does not have a private right of action under the IDEA because the IDEA does not give municipalities such an action against state defendants. Therefore, it follows that Bloomfield has failed to state a claim upon which relief can be granted. The State Defendants also argue that Bloomfield cannot file a due process petition against the Department pursuant to 20 U.S.C. § 1415(b).

Bloomfield relied heavily on <u>S.C. v. Deptford Twp. Bd. of Educ.</u>, 213 F. Supp. 2d 452 (D.N.J. 2002) which held that the IDEA provided an LEA with a private right of action to sue a

13

state defendant for a portion of the costs of providing a FAPE.  The State Defendants relied on the unreported decision in <u>Lawrence Twp. Bd. of Educ. v. State of New Jersey</u>, Civ. A. No. 03-4073 (D.N.J. 2004) which held that the IDEA does not create a cause of action for an LEA against the state to compel funding.  After the instant motions were fully briefed the Court of Appeals affirmed <u>Lawrence</u>, thus rejecting Bloomfield's position and holding that IDEA does not provide a school district with a private right of action.  <u>Lawrence Township Board of Education v. New Jersey</u>, 417 F.3d 368 (3dCir. 2005).

The Lawrence Township Board of Education instituted an action against the State of New Jersey seeking to compel it to fund E.E.'s, a disabled child, residential placement.  The Board asserted that the NJDOE failed to promulgate an interagency agreement with the New Jersey Department of Developmental Disabilities ("DDD") pursuant to mandates of the IDEA and that its failure to do so resulted in the DDD's refusal and failure to pay for E.E.'s residential program.  The State moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) claiming that the IDEA does not afford the Board a private right of action.  The district court granted the motion.

Affirming, the Court of Appeals stated:

> Section 1415(a) of the IDEA, entitled "establishment of procedures," provides that procedures shall be established and maintained "in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of [a FAPE]." 20 U.S.C. § 1415(a) (2003) (emphasis added). Similarly, section 1412(a)(6), which is entitled "procedural safeguards," provides that "[c]hildren with disabilities and their parents are afforded the procedural safeguards required by section [1415]." 20 U.S.C. § 1412(a)(6)(A) (2003).
>
> This language strongly suggests that Congress intended to provide a private right of action only to disabled children and their parents. Indeed, section 1415(b), which sets forth the types of procedures required, limits most relief under those

procedures to the parents of a disabled child.

…

While section 1415(b)(6) is crafted more broadly than other subsections, this fact alone does not indicate an intent to permit a private right of action by an LEA against a state. Instead, when examined in the context of the IDEA as a whole, the language of section 1415(b)(6) is at best ambiguous.

…

For similar reasons, Lawrence Township has no implied right of action under the IDEA. As the Supreme Court has instructed, "'unless [the] Congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.'" As the District Court noted, "this case is not about the child's educational needs, but rather the Township's fiscal ones." App. 25. A budgetary dispute between local and state agencies is simply not among the private actions contemplated by the IDEA, and is traditionally the type of dispute left to state and local authorities.

417 F.3d at 371 (citations omitted)

The Court of Appeals decision in <u>Lawrence</u> is dispositive, and the State Defendants' other grounds for dismissal need not be considered. The motion of the State Defendants to dismiss Bloomfield's complaint will be granted. By the same token, Bloomfield's motion for summary judgment on its complaint against the State Defendants will be denied.

B. <u>Cross Motions for Summary Judgment</u>

Bloomfield has moved for summary judgment reversing the ALJ's decision. SC has moved for summary judgment affirming the ALJ's decision and has moved for sanctions to be imposed upon Bloomfield or its attorneys.

A motion for summary judgment will be granted if after drawing all inferences in favor of

15

the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". Fed. R. Civ. P. 56(c); *Apalucci v. Agora Syndicate, Inc.*, 145 F.3d 630, 631 (3d Cir. 1998); *Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir. 1989); *Davis v. Portline Transportes Maritime Int'l*, 16 F.3d 532, 536 n. 3 (3d Cir. 1994); *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue may exist if the record taken as a whole could lead a rational trier of fact to find for the party opposing summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Under Fed. R. Civ. P. 56(c), the moving party bears the burden of pointing out to the district court an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The court will take the nonmoving party's allegations of fact as true. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976). If the moving party meets its burden, the opposition bears the burden of "set[ting] forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In the present case there are no issues of material fact. The question is one of law, whether in the undisputed circumstances of this case Bloomfield is obligated to pay for T.M.'s residential program.

Any party aggrieved by the decision of an Administrative Law Judge has a right to appeal to a state court of competent jurisdiction or to a federal district court. 20 U.S.C. § 1415(e)(2).

16

Pursuant to 20 U.S.C. § 1415(i)(1)(A) and 34 C.F.R. § 300.510, the decision is final and appealable to a United States District Court by filing a Complaint.  The standard of review of administrative decisions issued under the IDEA is *de novo* for questions of law and modified *de novo* for findings of fact. *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260 (3d Cir. 2003); *Carlisle Area Sch. Dist. v. Scott P.*, 62 F.3d 520 (3d Cir. 1995); *P.N. v. Greco*, 282 F.Supp.2d 221 (D.N.J. 2003).  When reviewing an ALJ's decision under the IDEA, the reviewing court shall receive the records of the administrative proceedings, 20 U.S.C. § 1415(e), and the district court shall give due weight to those proceedings. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982); *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260 (3d Cir. 2003); *S.C. v. Deptford Twp. Bd. of Educ.*, 213 F.Supp.2d 452 (D.N.J. 2002); *S.C. v. Deptford Twp. Bd. of Educ.*, 248 F.Supp.2d 368, 375-76 (D.N.J. 2003).

The Court of Appeals for the Third Circuit "has interpreted the Supreme Court's decision in *Rowley* to require that a court consider-although not necessarily to accept-the administrative findings of fact", and "if the district court chooses to depart from the agency's ruling, it should provide some explanation for its departure." *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d at 269-70.  "Factual findings from the administrative proceeding are to be considered *prima facie* correct." *Id.* (citations omitted).  When a district court hears additional evidence, it may accept or reject the ALJ's findings; however, when no additional evidence is presented, the court must find evidence contained in the record to support factual conclusions different from those of the ALJ. *Id.* at 270.

Bloomfield contends that it should be granted summary judgment because the ALJ erred as a matter of law in determining that Plaintiff is required to finance a residential placement for

T.M.  Bloomfield's arguments in support of its contention are 1) T.M.'s medical and educational needs were not inextricably intertwined; 2) T.M. needed residential placement for his severe psychiatric problems, not to provide him with a FAPE; 3) the ALJ misconstrued the meaning of *Cedar Rapids Cmty. Sch. Dist. v. Garret F*, 526 U.S. 66 (1999) and her broad reading of the case was not supported by the text of her opinion; 4) the ALJ disregarded the educational/medical needs analysis required by *Kruelle v. New Castle County Sch. Dist.,* 642 F.2d 687 (3d Cir. 1981); 5) *Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883 (1984) is not relevant to this case; and 6) the weight of credible evidence before the ALJ established that psychiatric stabilization was required before appropriate educational programming decisions could be made.

The record establishes, as the ALJ found, that Bloomfield did not develop an IEP that was reasonably calculated to provide T.M. with a FAPE.  His assignment to the High Point School was a failure, and an assignment to Forest Glen was no better.  At this point there is no disagreement that a component of a FAPE must be a residential facility, such as Kids Peace which T.M. now attends.

Bloomfield's contention that Kids Peace is simply a psychiatric treatment facility and thus within the medical exclusion is not supported by the record, given the wide scope the courts have given to required "related services" and the narrow scope they have given the "medical" exclusion.  Related Services means "transportation and such developmental, corrective, and other supportive services as are required to assist a child with a disability to benefit from special education." 20 U.S.C. §1401(22); 34 C.F.R. 300.24(a).  They include psychological services, counseling, health services, social work services, parent counseling and training and medical services for diagnostic and evaluation purposes.  20 U.S.C. §1401(22); 34 C.F.R. §300.24(a).

18

These are the kinds of services that a residential facility is expected to provide T.M.  The record reflects the extensive efforts Bloomfield and S.C. have made to find a less restrictive environmental that would provide a FAPE.  All failed.  In these circumstances "the program, including non-medical care and room and board, must be at no cost to the parents of the child." 34 C.F.R. §302.302.

T.M.'s psychiatric stabilization is a necessary part of his educational program.  This is a continuing, interrelated process in which his psychological difficulties and his education continue in tandem.  While medical doctors and psychiatrists may diagnose and evaluate T.M. and aides may provide continuing counseling and monitoring, it is part of an educational process.  Without the diagnosis and evaluation and without the counseling and monitoring the educational process could not take place.

In <u>Irving Independent School Dist. v. Tatro</u>, 468 U.S. 883 (1984), the Court addressed the question whether providing clean intermittent catheterization ("CIC") to a student constituted a related service that a school district was required to provide under the IDEA or whether providing CIC was excluded as a related service because it was a "medical service" serving purposes other than diagnosis or evaluation.  The Court held that "[b]y limiting the "medical services" exclusion to the services of a physician or hospital . . . the Secretary has given a permissible construction of the provision."  468 U.S. at 893.

In <u>Cedar Rapids Cmty. Sch. Dist. v. Garret F.</u>, 526 U.S. 66 (1999) the Court rejected a school district's effort to apply a multifactor test to determine whether services constituted "medical services."  The Court rejected that approach, stating, "[w]hatever its imperfections, a rule that limits the medical services exemption to physician services is unquestionably a

19

reasonable and generally workable interpretation of the statute. Absent an elaboration of the statutory terms plainly more convincing than that which we reviewed in <u>Tatro</u>, there is no good reason to depart from settled law." 526 U.S. at 76. Third Circuit Court of Appeals authority is consistent with <u>Tatro</u> and <u>Cedar Rapids</u>, <u>Kruelle v. New Castle County Sch. Dist.</u>, 642 F.2d 687 (1981).

T.M.'s residential placement is necessary for educational purposes. He cannot obtain educational benefits unless his educational program is accompanied by therapeutic treatment. Bloomfield must pay for the costs of the residential facility including diagnostic and evaluative medical services. It follows that Bloomfield's motion for summary judgment reversing the ALJ's order will be denied; S.C.'s motion for summary judgment affirming the ALJ's order will be granted.

S.C. moves for sanctions against the Board or its attorneys pursuant to Fed. R. Civ. P. 11(1)(B), contending that the arguments raised by counsel are not warranted by existing law and have no evidentiary support. It is true that Bloomfield has lost on the merits. However, as in many IDEA cases, extraordinarily difficult problems exist concerning the best way to deal with a person as psychologically damaged as T.M. Medical, psychiatric and educational problems abound, all of which must be dealt with in an often emotionally charged context. It may be that no satisfactory outcome is possible. In such a situation opinions can and will vary and no one can be sure he or she has the right answer. Bloomfield cannot be faulted for advancing its position. Sanctions are not warranted, and S.C.'s motion will be denied.

IV.  <u>Conclusion</u>

Bloomfield's motion for summary judgment against the State Defendants will be denied.

The State Defendants' motion to dismiss the complaint against it will be granted.  Bloomfield's motion for summary judgment reversing the ALJ's June 29, 2004 opinion and order will be denied.  S.C.'s motion for summary judgment affirming the ALJ's June 29, 2004 opinion and order will be granted.  S.C.'s motion for sanctions will be denied.  The court will enter an appropriate order.

/s/   Dickinson R. Debevoise
_____
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: September 21, 2005